```
            IN THE UNITED STATES DISTRICT COURT FOR
            THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                               *
AMERICAN MENSA, LTD.,
                               *
     Plaintiff,
                               *
          v.                          CIVIL NO.: WDQ-07-3283
                               *
INPHARMATICA, LTD., et al.,
                               *
     Defendants.
                               *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

American Mensa, Ltd. ("Mensa") sued Inpharmatica, Ltd. ("Inpharmatica") and BioFocus DPI, Ltd. ("BioFocus") (collectively the "Defendants") for trademark violations of the Lanham Act[1] and Maryland common law.  Pending are the Defendants' motion for summary judgment and Mensa's motion to amend the scheduling order.  For the following reasons, the Defendants' motion will be granted in part and denied in part, and Mensa's motion will be granted.

I.   Background

Mensa is a non-profit organization founded in 1960 whose members have scored within the top two percent of the general

---

[1] Specifically, Mensa claims trademark infringement under 15 U.S.C. § 1114(1), unfair competition under 15 U.S.C. § 1125(a)(1)(A), and dilution under 15 U.S.C. § 1125(c).

population on intelligence tests.[2]  Mensa's primary purpose is to
provide services and goods to its members, known as "Mensans."
Mensa administers intelligence tests, encourages and publishes
research on intelligence, and grants scholarships.  Mensa
publishes research through its trademark, MENSA (the "Mensa
Mark").

A.   Mensa's Trademarks

On October 17, 1967, the U.S. Patent and Trademark Office
("PTO") granted trademark number 837,288 to Mensa British
International Membership Association for use of the Mensa Mark to
conduct meetings, administer intelligence tests, and engage in
research.  The trademark was assigned to Mensa in February 1983.
On July 18, 1972, the PTO granted trademark number 938,219 to
Intermensa Limited for use of the Mensa Mark to administer
intelligence tests and organize research.  It was assigned to
Mensa in February 1983.

On August 12, 1986, the PTO granted trademark number
1,405,382 to Mensa for use of the Mensa Mark to indicate
membership in Mensa.  On July 14, 1988, the PTO granted trademark
number 1,492,188 to Mensa for use of the Mensa Mark to publish
magazines and books about Mensa's activities.  On January 2,
1992, the PTO granted trademark 1,789,822 to Mensa for use of the

---

[2] Plaintiff American Mensa, Ltd. is the United States
affiliate of a group of affiliated Mensa organizations throughout
the world.

trademark MENSA SELECT for intellectually stimulating games.  On
August 30, 2005, the PTO granted trademark number 2,988,739 to
Mensa for use of the Mensa Mark for clothing and accessories
sales on the Internet and through mail order.  On May 28, 2008,
Mensa filed a trademark application[3] for use of the mark MENSA
PROCESS in business consultation services.  Mensa's licensee has
used Mensa Process for over four years.

Mensa's primary revenue is through its membership dues, and
it spends little money on advertising and marketing.  Mensa has
allowed third parties to use the Mensa Mark for their sale of
goods and services.[4]

B.   Use of the ADMENSA Trademark

Inpharmatica, a United Kingdom corporation, conducts
research to discover and optimize new pharmaceutical drugs.
Inpharmatica owns the rights to the ADMENSA[5] trademark.  It uses
the ADMENSA mark to promote its services as "intelligent."
Inpharmatica has never disclaimed a relationship with Mensa.

In December 2006, Inpharmatica and Galapagos NV, a Belgian

---

[3] U.S. Trademark Application Serial No. 76/690,066.

[4] Some of these goods and services include: computers,
investment funds, automobiles, board games, quiz shows, books,
puzzles, magazines, and fast food restaurants.

[5] The parties dispute the stylization of the mark, so for
purposes of this opinion, stylization is only relevant where
noted.  Mensa states that the mark was "AdMensa" for years until
the Defendants changed it to "ADMEnsa" after Mensa complained.

company, merged.  As a result, Inpharmatica became part of
BioFocus, another United Kingdom corporation, and joined
Galapagos's drug discovery business.  Using the ADMENSA mark,
BioFocus began selling in the United States the goods and
services Inpharmatica had been selling abroad.  In June 2004,
Inpharmatica applied for use of the ADMENSA mark for a variety of
services.[6]  The mark was going to be used for drug research,
notably in pharmacokinetic and ADME (adsorption, distribution,
metabolism, elimination)[7] analysis, modeling properties "in
silico," and computer-aided molecular design and compound
selection.  The application was published for opposition and
Mensa asked Inpharmatica to withdraw its application because the
mark would damage Mensa; Inpharmatica refused.  On November 22,
2006, Mensa filed an opposition to Inpharmatica's application
with the PTO's Trademark Trial and Appeal Board.

---

[6] Services listed in the application were: (1) computer
hardware and software for use in chemical modeling, molecular
design, chemical data analysis, and drug discovery information
systems; (2) provision of access to databases and computers for
the purpose of analysis of information; (3) experimental
laboratory processes, including those relating to solubility,
metabolic stability, analysis of chemical compounds, and
provision of information relating to biology, pharmacokinetics,
and drug development.  Second Amend. Compl. at ¶ 36.

[7] In their motion for summary judgment, the Defendants state
that ADME stands for adsorption, distribution, metabolism, and
elimination.  Defs. Mot. S.J. at 2.  Later in their motion,
however, they state that it stands for absorption, distribution,
metabolism, and excretion.  *Id.* at 23.  For the purposes of this
opinion, the Court will refer to the former meaning, though it
passes no judgment on the actual meaning.

During discovery in the PTO proceeding, Mensa learned that
Inpharmatica had begun using the ADMENSA mark in the U.S.   On
December 6, 2007, Mensa filed this suit seeking an injunction
preventing the Defendants from using the ADMENSA mark, and
forcing the Defendants to destroy their goods and materials
bearing the mark.   Mensa also sought (1) to enjoin the Defendants
from using the websites that contained the mark, (2) payment of
the Defendants' profits derived from the mark, and (3) punitive
damages.   On January 25, 2008, Mensa amended its Complaint.   On
February 11, 2008, the Defendants counterclaimed seeking
cancellation of Mensa's marks because Mensa is only a licensee of
the marks, and because Mensa had abandoned its rights because it
had not enforced its rights against third-party use of the marks.

On July 25, 2008, Mensa filed a Second Amended Complaint.
On August 8, 2008, the Defendants filed an amended counterclaim.
During discovery, Mensa voluntarily cancelled its two
registrations in MENSA PROCESS, which were involved in this
dispute.   On August 25, 2008, the Defendants moved for summary
judgment on Mensa's claims.

II.  Analysis

A.   Standard of Review

Under Rule 56(c), summary judgment is appropriate when there
is no genuine issue of material fact, and the moving party is
entitled to judgment as a matter of law.   *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must view the facts and reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  The opposing party, however, must produce evidence upon which a reasonable factfinder could rely.  *Celotex*, 477 U.S. at 324.  A mere "scintilla" of evidence is insufficient to preclude summary judgment.  *Anderson*, 477 U.S. at 252.

B.   Trademark Infringement and Unfair Competition

In Counts I and IV, Mensa alleges that the Defendants have infringed its trademark in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and Maryland common law, by using "a colorable imitation" of the Mensa Mark that is likely to confuse consumers.  In Count II, Mensa claims that the Defendants unfairly competed with it in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  Infringement cases under Maryland law and the Lanham Act, as well as Lanham Act unfair competition claims, are analyzed under the same framework. *Synergistic Intern., LLC v. Korman*, 470 F.3d 162, 170 (4th Cir.

6

2006); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995); *Cmty. First Bank v. Cmty. Banks*, 360 F. Supp. 2d 716, 722 (D. Md. 2005); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002).  Thus, the Court considers the claims together.

Section 32(1) of the Lanham Act prohibits the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . or advertising of any goods or services . . . [that] is likely to cause confusion, or . . . mistake." § 1114(1).  To prove trademark infringement or unfair competition, Mensa must show that (1) it owns a valid trademark; (2) the Defendants use a colorable imitation of the mark in commerce without Mensa's consent; and (3) such use is likely to cause confusion.  *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 259 (4th Cir. 2007).  The Defendants contest only the third element in their summary judgment motion.

A trademark infringes the holder's rights "if it is likely to confuse an ordinary consumer as to the source or sponsorship of the goods." *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 366 (4th Cir. 2001) (*quoting Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)) (internal quotations omitted).  The Court examines how the parties use the marks to determine the likelihood of confusion.

*CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006). Whether a likelihood of confusion exists is inherently a factual issue, and "summary judgment is the exception." *Nat'l Fed'n of the Blind, Inc. v. Loompanics Enters. Inc.*, 936 F. Supp. 1232, 1241 (D. Md. 1996). But, "where an inference of probable consumer confusion can not reasonably be drawn . . . summary judgment is appropriate." *Id.* at 1241-42; *Sterling Acceptance*, 227 F. Supp. 2d at 461.

Whether a mark is likely to cause confusion depends on several factors: (1) the strength or distinctiveness of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the goods or services the marks represent; (4) the similarity of the facilities the parties use in their business; (5) the similarity of the parties' advertising; (6) the defendant's intent; and (7) actual confusion. *Louis Vuitton*, 507 F.3d at 259-60. Sometimes courts also review the quality of the defendant's product and the sophistication of their consumers. *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996). This determination is done on a case-by-case basis, and the Court need not weigh each factor equally. *Anheuser-Busch*, 962 F.2d at 320. Indeed, actual confusion is often the most important factor in the inquiry. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001); *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 652 (D.

8

Md. 2002).

     1.   Strength of the Mensa Mark

"[T]he first and paramount factor in assessing the likelihood of confusion is the distinctiveness of the senior user's mark." *IDV North America, Inc. v. S&M Brands, Inc.*, 26 F. Supp. 2d 815, 833 (E.D. Va. 1998). "The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst of Maryland*, 434 F.3d at 269. A strong trademark is rarely used by parties besides the owner, while a weak mark is often used by others. *Id.* at 270. A mark's strength "is evaluated in terms of its conceptual strength and commercial strength." *Id.* at 269 (*quoting GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000)). Conceptual strength measures a mark's uniqueness, while commercial strength relates to its marketplace recognition. *Sterling Acceptance*, 227 F. Supp. 2d at 461.

     a.   Conceptual Strength

A trademark's conceptual strength "focuses on the linguistic or graphical peculiarity of the mark." *CareFirst of Maryland*, 434 F.3d at 269. Frequent prior use of a mark's text in other marks--especially in the same field--shows a lack of conceptual strength. *Id.* at 270. Prior use is most important when there are many third-party trademark registrations for the same mark.

9

*Petro Shopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997).  Frequent third-party use shows that the mark has a well recognized meaning, and is thus weak.  *Id.* at 94.

The first step is to place a mark on the conceptual strength spectrum.[8]  *Id.*  Courts have categorized marks into four classes in increasing order of strength: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary.  *Lone Star Steakhouse*, 43 F.3d at 933.  Arbitrary marks involve terms that do not suggest or describe any ingredient, quality of characteristic of the goods or services they represent.  *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.*, 61 F. Supp. 2d 426, 430 (D. Md. 1999); *see Sara Lee*, 81 F.3d at 464 (examples of arbitrary marks are "Tea Rose" flour, "Camel" cigarettes, and "Apple" computers).  A word is descriptive "if it identifies a characteristic or quality of an article or service," and is suggestive "if it suggests rather than describes some characteristic of the goods . . . and requires the consumer to exercise his imagination to reach a conclusion as to the nature of the[] goods."  *Lone Star Steakhouse*, 43 F.3d at 934; *see Sara Lee*, 81 F.3d at 464 (an example of a descriptive mark is "5 minute glue," and examples of suggestive marks are "Coppertone," "Orange Crush," and

---

[8] The spectrum was first described in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).

"Playboy"). In short, "if the mark imparts information directly, it is descriptive," but if "it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." *Synergistic Intern., LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006) (*quoting Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528 (4th Cir. 1984)).

Descriptive marks are protected only with proof of secondary meaning, while suggestive marks are presumptively valid. *Lone Star Steakhouse*, 43 F.3d at 933. Descriptive marks are "narrowly circumscribed in their legal protection" and usually enforced "only against similar marks which are used on virtually identical products." *Pizzeria Uno*, 747 F.2d at 1527 (*quoting* 1 GILSON, TRADEMARK PROTECTION AND PRACTICE, § 2.01, pp. 2-4 (1984)). On the other hand, suggestive marks are protected against the use of the same or a similar mark on even unrelated products that "the public is likely to assume emanate[s] from the trademark owner." *Id.* (*quoting* 1 GILSON, pp. 2-4).

The PTO's determination of whether a mark is descriptive or suggestive is *prima facie* evidence of that classification. *Lone Star Steakhouse*, 43 F.3d at 934. If the PTO does not require proof of secondary meaning, it is assumed that it believed the mark was suggestive. *Petro Stopping Ctrs.*, 130 F.3d at 92. However, a mark's classification is not conclusive, and a suggestive mark may nonetheless be found weak. *Id.* at 93;

*Sterling Acceptance*, 227 F. Supp. 2d at 462.  The mark's strength "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." *Petro Stopping Ctrs.*, 130 F.3d at 92 (*quoting Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997)).  Thus, courts also examine the extent consumers have applied a secondary meaning to the mark.  *Id.*

There is no evidence, nor do the Defendants argue, that the PTO required evidence of secondary meaning for the Mensa Mark. Further, the word "mensa" stems from the Latin word meaning table, Def.'s Ex. 26 (Mensa Mark registrations); because Mensa is an organization for individuals with high IQs, the word "mensa" does not denote the nature of the good or service.  *See, e.g.*, *A.C. Legg Packing*, 61 F. Supp. 2d at 430 ("OLD PLANTATION" is inherently distinctive because it does not suggest any image of its product, spices); *World Gym Licensing, Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 622 (D. Md. 1999) ("WORLD" is an arbitrary mark because it "has no descriptive connotation in the fitness industry").  The Mensa Mark has been registered for use in (1) conducting meetings, administering intelligence tests, and conducting research[9]; (2) indicating membership in a society in which a requirement for membership is a score at or above the

---

[9] PTO registration numbers 837,388 (Oct. 17, 1967) and 938,219 (July 18, 1972).

ninety-eighth percentile on an IQ test[10]; (3) magazines and books regarding Mensa's activities and other intellectual pursuits[11]; and (4) clothing, headgear, puzzles and games, among others.[12] Def.'s Ex. 26.  MENSA SELECT has been registered for use in board games and manipulative games.[13]  *Id.*  The Mensa Mark is arbitrary, and is thus entitled to greater protection.

Moreover, there is a limited number of other trademarks that include "mensa."  The Defendants point out that there are 15 other marks that include "mensa."  However, some of these marks-- such as "HUMENZA" and "MENZACUT"--do not contain the same spelling of "mensa."  Further, 15 comparable marks--irrespective of field--is substantially less than the number of marks that courts have held weakened the marks at issue.  *See Petro Stopping Ctrs.*, 130 F.3d at 93-94 (mark weak when 117 third-party registrations contained "PETRO," including 63 in the same business, and over 2,700 businesses in the United States use "PETRO" as part of their name); *Sterling Acceptance*, 227 F. Supp. 2d at 462 (mark weak when 18 financial services registrations, and over 350 total registrations, contained "Sterling"); *Estee Lauder*, 108 F.3d at 1511 (70 mark registrations and pending

---

[10] PTO registration number 1,405,382 (Aug. 12, 1986).

[11] PTO registration number 1,492,188 (June 14, 1988).

[12] PTO registration number 2,988,739 (Aug. 30, 2005).

[13] PTO registration number 1,789,822 (Aug. 24, 1993).

13

applications including the same term--some in the same field--
shows weakness).  As a result, the Mensa Mark is conceptually
strong.

   b. Commercial Strength

  Commercial strength considers "the marketplace and asks if
in fact a substantial number of present or prospective customers
understand the designation when used in connection with a
business to refer to a particular . . . business enterprise."
*CareFirst of Maryland*, 434 F.3d at 269 (*quoting Perini Corp. v.
Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)).  The
proper inquiry looks at a consumer in the "relevant population."
*Synergistic Intern.*, 470 F.3d at 173 (*quoting CareFirst of
Maryland*, 434 F.3d at 269).  The Court looks at the extent to
which consumers have placed a "secondary meaning" on the mark.
*Petro Stopping Ctrs.*, 130 F.3d at 93.

  Large advertising budgets evidence commercial strength.  *See
Synergistic Intern.*, 470 F.3d at 174; *Giant Brands*, 228 F. Supp.
2d at 652 ($40 million spent on advertising and $10 million on
consumer education and programs, coupled with 1.5 million bonus
card users and 80% recognition in focus group shows strength);
*A.C. Legg Packing*, 61 F. Supp. 2d at 430 (72 years of
advertisement in trade magazines and brochures, and on the
Internet).  Non-advertising publicity through television, radio,
and other media can also increase a mark's strength.  *See World*

14

*Gym Licensing*, 47 F. Supp. 2d at 622 (name and logo featured in movies and on television and radio increases mark's strength). For entities with memberships, a large membership increases its mark's strength. *See Giant Brands*, 228 F. Supp. 2d at 652 (1.5 million bonus card users of grocery store is a factor showing strength); *World Gym Licensing*, 47 F. Supp. 2d at 622  (mark stronger because the business had over 500,000 members).

Mensa's advertising budget is minimal; from 2003-2007, it spent $7,000-$22,000 a year on advertising, and $700-$10,000 a year on public relations.  Def.'s Ex. 9.  But it has received considerable attention in the media.  For example, from April 2003 to March 2004, Mensa was mentioned 452 times in newspapers, 56 times in magazines, on television 22 times, and on radio 8 times.  Def.'s Ex. 11.  Mensa has been highlighted in a variety of television shows, movies, newspapers and magazines since 1979.[14]  Catherine Barney Dec. ¶¶ 10-23, Sep. 18, 2008.  Mensa's membership consists of 45,000-55,000 members.  Pamela Donahoo Dec. ¶ 4, Sep. 18, 2008; Def.'s Ex. 16.  Although its membership

---

[14] Mensa has been mentioned in movies such as *You, Me and Dupree* (2006), *A Beautiful Mind* (2001), *Me, Myself and Irene* (2000), and *Contact* (1997).  Barney Dec. at ¶ 11.  It has been mentioned in televisions shows such as *The Simpsons*, *The Apprentice*, *Who Wants to Be a Super Millionaire?*, *Test the Nation 1* and *2*.  *Id.* at ¶ 10.  Cable News Network ("CNN"), *20/20*, *Good Morning America*, *Regis and Kathy Lee*, and *The View* have run stories about Mensa.  *Id.*  Mensa has also appeared in newspapers including *The Wall Street Journal*, *New York Times*, and *USA Today*, and magazines such as *Readers' Digest*, *Playboy* and *Playgirl*.  *Id.* at ¶¶ 12, 14-15, 23.

15

is large, it is not as big as the memberships that factored
towards commercial strength in prior cases.

As noted above, the Mensa Mark is arbitrary and conceptually
strong.  It is "inherently distinctive" and "receive[s] the
greatest protection against infringement." *Sara Lee*, 81 F.3d at
464.  Although Mensa has not advertised much and its membership
is not particularly large, it has received a substantial amount
of media attention.  Through this publicity, the general public
can identify the Mensa Mark as representing Mensa as a group with
members of high intelligence.  This factor weighs in Mensa's
favor.

    2.   Similarity of the Marks

Marks are similar if there is a "similarity in appearance
and sound which would result in confusion." *Petro Stopping
Ctrs.*, 130 F.3d at 94 (*quoting Pizzeria Uno*, 747 F.2d at 1534).
The "dominant term"--a distinctive word that has meaning and
distinction for the consumer--is given greater weight when
evaluating similarity.  *Lone Star Steakhouse*, 43 F.3d at 936
("Lone Star Café" and "Lone Star Grill" are similar because they
share the dominant "Lone Star" term, which is printed larger in
ads); *Pizzeria Uno*, 747 F.2d at 1534-35 ("Pizzeria Uno" and "Taco
Uno" are similar because "Uno" is the dominant word and are
printed larger in ads, while the other terms describe the good);
*World Gym Licensing*, 47 F. Supp. 2d at 623 ("World" is dominant

16

term in "World Gym" and "Fitness World" as the other terms merely describe the type of business, and was placed prominently in some advertising and merchandise); *A.C. Legg Packing*, 61 F. Supp. 2d at 430-31 ("Olde Plantation Spice" and "Old Plantation" are nearly identical and contain the same dominant term, "Old Plantation").

To determine if marks are similar, the Court "examine[s] the allegedly infringing use in the context in which it is seen by the ordinary consumer." *CareFirst of Maryland*, 434 F.3d at 271. The Court looks at the actual use of the marks in the marketplace, including their colors and designs. *Id.*; *Petro Stopping Ctrs.*, 130 F.3d at 94 (marks dissimilar because did not contain the same logo or design and were different colors); *World Gym Licensing*, 47 F. Supp. 2d at 623 ("World Gym" and "Fitness World" similar when both designs included a globe); *Sterling Acceptance*, 227 F. Supp. 2d at 462 (mark with triangle, horizontal lines and a dollar symbol with the words "Sterling," "Acceptance," and "Corporation" on separate lines underneath not similar to mark with "Sterling" above, and "Associates" underneath, an anchor logo); *but see A.C. Legg Packaging*, 61 F. Supp. 2d at 431 (mark including a red border "does not detract from the essential similarity of the marks" when the marks were nearly identical).

The Defendants argue that ADMENSA stems from the Latin word

17

"admensus," meaning to measure out to.  Def.'s Ex. 1.  However, there is evidence showing that the Defendants never used "admensus" in its literature or advertising or in its daily operations.  Matthew Segall Dep. 156-157, June 18, 2008.  It is unclear whether the Defendants used the ADMENSA mark to denote its Latin meaning, or to relate to Mensa.  Admittedly, the Defendants registered the "Admensa" mark as ADMENSA, without stylization.  Def.'s Mot. S.J. at 12.  Then, sometime in 2006 or 2007, the Defendants began displaying their mark as "ADMEnsa," with the first four letters capitalized.

The "ad" at the beginning of the ADMENSA mark does not clearly distinguish it from the Mensa Mark.  *See Sara Lee*, 81 F.3d at 465 ("L'eggs" and "Leg Looks" are similar because of the latter's first syllable).  Naturally, the ADMENSA mark stylized as "Admensa" would resemble the Mensa Mark more closely than "ADMEnsa."  The record is also unclear as to the Mensa Mark's general appearance and to what extent the ADMENSA or "ADMEnsa" mark looks like it.  On its face, the ADMENSA mark is somewhat similar to the Mensa Mark, especially in its "Admensa" style.

> 3.   Similarity of Mensa's and the Defendants' Services

The third factor is the similarity of the parties' services. *CareFirst of Maryland*, 434 F.3d at 272.  When the parties deal in similar goods or services, there is a higher chance of confusion. *See id.* at 465-66 (both parties involved in women's hosiery);

*Pizzeria Uno*, 747 F.2d at 1535 (Italian restaurant and Mexican fast food restaurant are similar services); *Sterling Acceptance*, 227 F. Supp. 2d at 463 (marine financing competitors provided similar services). If two parties' services are not similar, when viewed in their entirety, it favors a finding of no infringement. *See Petro Stopping Ctrs.*, 130 F.3d at 94-95 (third factor weighed against infringement when sale of fuel was the only similarity between the parties).

The Defendants provide software, tools and research related to compounds and drug discovery. Mensa is an organization for individuals with high intelligence, and whose self-proclaimed main purpose is to serve its members. Pl.'s Opp. at 4. Mensa has stated that its licensees that use the Mensa Mark have done so for, among others, computer sales, investment funds, cars, games, quiz shows, books, and fast food restaurants. *Id.* at 4-5. Mensa argues, however, that many of its members are in health care, and it sponsors colloquia and research in biotech and medical areas. *Id.* at 33-34. Mensa also argues that one if its licensees, the Leveraged Marketing Corporation of America ("LMCA"), has 25% of its business in health care and is a competitor of the Defendants.

Even assuming LMCA competes with the Defendants, the services are not sufficiently similar. LMCA is only a licensee of Mensa's, and only a portion of LMCA's business competes with

19

the Defendants.  This is not a situation involving two competitors selling the same product.  Rather, the Defendants do pharmaceutical research and development, while Mensa is a club for individuals that licenses its mark to third parties to sell various goods.  Viewing the parties' similarity in their entirety, this factor favors the Defendants.

   4. The Defendants' Intent[15]

  Bad faith is not required to prove trademark infringement. *A.C. Legg Packaging*, 61 F. Supp. 2d at 431.  However, evidence of bad faith strongly indicates a likelihood of confusion.  *Sterling Acceptance*, 227 F. Supp. 2d at 463.  If the infringer intended to confuse the public, this shows a likelihood of confusion because "one intending to profit from another's reputation generally attempts to make his . . . advertisements . . . resemble the other's so as . . . to induce confusion."  *Pizzeria Uno*, 747 F.2d at 1535.  Blind disregard for others' trademark rights can evidence bad faith.  *A.C. Legg Packaging*, 61 F. Supp. 2d at 431-32.  This includes failing to consult a trademark attorney or conduct a trademark search.  *Id.*  On the other hand, a party's

---

  [15] The parties and the Court agree that the fourth factor--similarity of the parties' facilities--is not relevant to this analysis; thus, the Court will not discuss it.  *See Pizzeria Uno*, 747 F.2d at 1527 (not all factors are necessarily relevant in each case).  Similarly, the parties devote very little of their briefs to the fifth factor: similarity in advertising.  Given the nature of the services provided by the parties, the Court agrees that advertising is less relevant in this analysis, and will thus not discuss it.

failure to complain about possible infringement for an extended period of time could preclude a finding of bad faith because it allows the infringer to believe his use is permissible. *World Gym Licensing*, 47 F. Supp. 2d at 623-24.

Inpharmatica stated in an interrogatory that it did not know of Mensa until commencement of this suit. Def.'s Ex. 34, Int. 10. It stated that only one of its employees knew of Mensa, but even she did know not of the Mensa Mark. *Id.* Inpharmatica stated that it chose the ADMENSA mark because it incorporated ADME, which the Defendants assert stands for adsorption, distribution, metabolism, and elimination. *Id.* at Int. 11; Def.'s Mot. S.J. at 23. Inpharmatica also stated that it wanted to choose a mark that was, or sounded, Latin. Def.'s Ex. 34, Int. 11. Ultimately, Inpharmatica stated, it chose the ADMENSA mark because it sounded Latin and was similar to the Latin verb "admensus," which means "to measure out to." *Id.*

Perhaps significantly, Inpharmatica did not seek the opinion of counsel before using the ADMENSA mark. Answer to Second Amend. Compl. at ¶ 33. There is evidence showing that a graphic design company for whom an Inpharmatica representative's brother works created a logo for "AdMensa," with a capitalized "M," thus placing importance on the "Mensa" aspect of the name. Clifton E. McCann Dec., Ex. 15, Sep. 18, 2008. Also, in an email between Inpharmatica representatives, one representative states that the

ADMENSA mark will set it apart from competitors because of "the mensa bit." Barbara L. Waite Dec., Ex. F, Sep. 18, 2008. Another Inpharmatica representative testified that its marketing related its services to intelligence. *Id.* at Ex. A, Segall Dep. 141-142. As a result, there is a genuine dispute as to whether the Defendants acted in bad faith in its use of the ADMENSA mark.

     5.   Actual Confusion

Actual confusion by consumers is "often paramount" in determining the likelihood of confusion. *CareFirst of Maryland*, 434 F.3d at 268; *Sterling Acceptance*, 227 F. Supp. 2d at 464. Indeed, evidence of actual confusion is "most compelling" in a likelihood of confusion analysis. *Lone Star Steakhouse*, 43 F.3d at 937. Although actual confusion is not required, its absence creates a strong inference against confusion. *Louis Vuitton*, 507 F.3d at 263; *CareFirst of Maryland*, 434 F.3d at 269. Surveys and anecdotal evidence--such as employee testimony of day-to-day confusion--are both considered in analyzing actual confusion. *World Gym Licensing*, 47 F. Supp. 2d at 624.

The evidence must show actual and substantial, not merely *de minimis*, confusion. *CareFirst of Maryland*, 434 F.3d at 268 (two percent of survey respondents indicated confusion); *see Sterling Acceptance*, 227 F. Supp. 2d at 465 (no actual confusion when plaintiff provided 10 instances of confusion in six years of business); *but see Resorts of Pinehurst, Inc. v. Pinehurst Nat.*

*Corp.*, 148 F.3d 417, 422-23 (4th Cir. 1998) (actual confusion existed when the defendant received numerous phone calls each week from people seeking the plaintiff, received shipments intended for the plaintiff, and plaintiff's survey showed substantial confusion); *World Gym Licensing*, 47 F. Supp. 2d at 624 (defendant's employee told plaintiff's private investigator that the two companies are mistaken often).

Indeed, the failure to provide more than a few instances of actual confusion "creates a presumption against likelihood of confusion in the future." *Petro Stopping Ctrs.*, 130 F.3d at 95 (*quoting Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)). As a guideline, the Fourth Circuit has stated that "evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent." *Sara Lee*, 81 F.3d at 467 n.15.

In its opposition, Mensa states that Inpharmatica only marketed and sold its product "to a small, targeted group of potential customers," and thus there is less opportunity for confusion. Pl.'s Opp. at 39. Mensa has not provided surveys or other evidence of confusion, but points only to the testimony of an Inpharmatica representative who stated that a pharmaceutical company customer once noted that ADMENSA included the word "mensa." Segall Dep. 168-169. Mensa contends that others in the pharmaceutical field will make the same association. Pl.'s Opp.

at 39.  This evidence falls woefully short of showing actual

confusion among consumers.  At best, it shows that some of

Inpharmatica's consumers draw a similarity between the names.  It

fails to show any actual confusion as to whether Mensa and

Inpharmatica are linked.  This factor strongly favors the

Defendants.

        6.   Sophistication of Consumers

    Although considered less frequently, the sophistication of

the usual consumers of the good or service is also a factor.

*Sara Lee*, 81 F.3d at 467; *Perini*, 915 F.2d at 127.  Buyer

sophistication is generally only a "key factor when the relevant

market is not the public at-large."  *Sara Lee*, 81 F.3d at 467.

"[I]n a market with extremely sophisticated buyers, the

likelihood of consumer confusion cannot be presumed" by

similarity in trade names.  *Id.* (*quoting Perini*, 915 F.2d at

128).

    Inpharmatica's customers are primarily the research and

development departments of pharmaceutical and biotech companies.

Def.'s Ex. 34, Int. 6.  Its customer companies' representatives

are almost always highly educated.  *Id.*  Mensa does not dispute

this.  Likewise, Mensa is a society for highly intelligent

individuals.  Its members and people interested in the

organization are generally sophisticated.  Though it is given

less weight than other factors, the sophistication of

24

Inpharmatica's consumers weighs against confusion and in the
Defendants' favor.

In sum, the Mensa Mark is strong.  However, the parties'
services are not related, as Mensa is an organization for
intelligent individuals, and the Defendants are in pharmaceutical
research.  Mensa's support of scientific colloquia and some
research does not make it sufficiently similar to the Defendants.
Mensa has provided no evidence of actual confusion.  And, the
relevant consumers are generally highly sophisticated.  There is
a genuine dispute about the aesthetic similarity of the marks, as
well as the Defendants' intent in creating the ADMENSA mark.
Although Mensa's inability to show actual confusion weighs
strongly against infringement, it is not required.  Viewing the
facts in Mensa's favor, summary judgment will be denied on its
Lanham Act infringement and unfair competition claims and its
Maryland common law infringement claim.

C.   Dilution of Trademark

In Count III, Mensa claims that the Defendants diluted the
Mensa Mark under the Lanham Act, 15 U.S.C. § 1125(c).[16]  That

---

[16] On October 6, 2006, the Trademark Dilution Revision Act
("TDRA") was enacted and it amended the Lanham Act.  *Argus
Research Group, Inc. v. Argus Media, Inc.*, 562 F. Supp. 2d 260,
281 (D. Conn. 2008).  The TDRA amended the Federal Trademark
Dilution Act of 1995 ("FTDA"), which had originally added a
dilution claim to the Lanham Act.  *Moseley v. V. Secret
Catalogue, Inc.*, 537 U.S. 418, 420-21 (2003); *Louis Vuitton*, 507
F.3d at 264 n.2.  Congress enacted the TDRA essentially to
overrule *Moseley*, which held that the FTDA "required proof of

section provides that

> the owner of a famous mark that is distinctive . . .
> shall be entitled to an injunction against another
> person who . . . [uses] a mark or trade name in
> commerce that is likely to cause dilution by blurring
> or dilution by tarnishment of the famous mark,
> regardless of . . . actual or likely confusion, of
> competition, or of actual economic injury.

§ 1125(c)(1).  Dilution by blurring occurs when "the similarity

between a mark or trade name and a famous mark . . . impairs the

distinctiveness of the famous mark."  *Id.* § 1125(c)(2)(B).

Distinctiveness "refers to the ability of the famous mark

uniquely to identify a single source and thus maintain its

selling power."  *Louis Vuitton*, 507 F.3d at 265.  Dilution by

tarnishment is "association arising from the similarity between a

mark or trade name and a famous mark that harms the reputation of

the famous mark."  § 1125(c)(2)(c).  The plaintiff in a dilution

claim "need not show actual or likely confusion, the presence of

competition, or actual economic injury."  *Id.* § 1125(c)(1); *Louis

Vuitton*, 507 F.3d at 265.

Dilution claims are reserved for a "select class of marks"

that have "such powerful consumer associations that even non-

competing uses can impinge on their value."  *Bd. of Regents,

Univ. of Texas Sys. v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 674

(W.D. Tex. 2008); *see Washington Speakers Bureau, Inc. v. Leading*

---

actual dilution and actual economic harm."  *Louis Vuitton*, 507
F.3d at 264 n.2.  As a result, only a likelihood of dilution must
be shown.  *Id.; see* § 1125(c)(1).

*Auths., Inc.*, 33 F. Supp. 2d 488, 502 (E.D. Va. 1999) (the FTDA protects "truly prominent and renowned" marks) (*quoting I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 45 (1st Cir. 1998)).  "One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer."  *KST Elec.*, 550 F. Supp. 2d at 679.

To be famous for dilution purposes, a mark must be more distinctive and stronger than that required in an infringement claim.  *See Washington Speakers Bureau*, 33 F. Supp. 2d at 502; *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) (noting that "[i]f dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we would upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses," and dilution protection is "the most potent form of trademark protection"); *KST Elec.*, 550 F. Supp. 2d at 674 ("Dilution causes of action, much more so than infringement and unfair competition laws, tread very close to granting rights in gross in a trademark.") (*quoting Avery Dennison*, 189 F.3d at 875) (internal quotations omitted).

"In other words, the mark must be a household name," and the TDRA does not "protect trademarks whose fame is at all in doubt." *KST Elec.*, 550 F. Supp. 2d at 674, 679 (*quoting* Barton Beebe*, A Defense of the New Federal Trademark Antidilution Law*, 16 Fordham

27

INTELL. PROP. MEDIA & ENT. L.J. 1143, 1158 (2006) and *citing* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104 (4th ed. 2008)); *see TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) (famous marks are those such as Dupont, Buick, and Kodak "that for the major part of the century have been household words throughout the United States" are "are representative of the best known marks in commerce").

To prove a dilution claim, Mensa must show that (1) the Mensa Mark is famous and distinctive; (2) the Defendants use a mark in commerce that is diluting the Mensa Mark; (3) similarity between the ADMENSA mark and the Mensa Mark gives rise to an association between them; and (4) the association is likely to impair the distinctiveness of the Mensa Mark or likely to harm its reputation. *Louis Vuitton*, 507 F.3d at 264-65. The Defendants seek summary judgment based on Mensa's failure to prove the Mensa Mark's fame.

A "mark is famous if it is widely recognized by the *general consuming public* . . . as a designation of source of the goods or services of the mark's owner." § 1125(c)(2)(A) (emphasis added).[17] The TDRA increases the threshold of fame, and thus

---

[17] The requirement that a mark be famous to the "general consuming public," rather than only a niche market, was one of the main revisions of the TDRA. *KST Elec.*, 550 F. Supp. 2d at 678; *Phase Forward Inc. v. Adams*, No. 05-4232, 2008 WL 340951, at *1 (N.D. Cal. Feb. 5, 2008); *see Vista India v. Raaga, LLC*, 501 F. Supp. 2d 605, 623-24 (D.N.J. 2007) ("Under the standard of whether a mark is famous, the question is whether the mark is

denies protection for marks that are famous only in niche markets. *Dan-Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 n.90 (S.D.N.Y. 2007); *Componentone, L.L.C. v. Componentart, Inc.*, No. 02:05-1122, 2007 WL 4302108, at *1 (W.D. Pa. Dec. 6, 2007); *Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*, No. 06-187, 2007 WL 1438114, at *5-6 (C.D. Cal. Feb. 23, 2007). District courts should, when possible, determine whether a mark is famous and thus able to acquire dilution protection. *Savin Corp. v. Savin Group*, 391 F.3d 439, 450 (2d Cir. 2004). A plaintiff can survive summary judgment by showing "more than a mere scintilla of evidence of fame." *Id.* (district court properly denied defendant's motion for summary judgment on fame issue when plaintiff spent over $20 million on advertising and earned $675 million in revenues in one year, and was regularly featured in magazines).

To determine whether a mark is famous, the Court considers factors including: (1) the scope and geographic reach of advertising and publicity of the mark; (2) the volume and geographic reach of sales of goods or services offered under the mark; (3) actual recognition of the mark; and (4) where the mark

---

well-known throughout the country by the *general* consuming public, regardless of the *relevant* consuming public.") (emphasis in original); 4 MᴄCᴀʀᴛʜʏ, *supra,* § 24:104 ("The 2006 version of the . . . TDRA is more rigorous in its test for fame than was the original 1996 Act.") (internal quotations omitted).

is registered.[18]  § 1125(c)(2)(A).

     1.   Advertising and Publicity

Although not required to show fame, a large advertising budget evidences a mark's notoriety. *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2008) ($350 million spent in advertising the HOT WHEELS mark supported finding of fame); *Hershey Co. v. Art Van Furniture, Inc.*, No. 08-14463, 2008 WL 4724756, at *14 (E.D. Mich. Oct. 24, 2008) (Hershey chocolate mark is famous, in part because it spends "tens of millions of dollars annually to maintain and promote its products"); *V Secret Catalogue, Inc. v. Moseley*, 558 F. Supp. 2d 734, 744 (W.D. Ky. 2008) (Victoria's Secret spent $454 million in advertising in 2006); *Visa Intern. Serv. Ass'n v. JSL Corp.*, 533 F. Supp. 2d 1089, 1096 (D. Nev. 2007) (Visa spent more than $1 billion on advertising in the U.S. each year from 1997-2000); *Nike, Inc. v. Nikepal Intern., Inc.*, No. 2:05-1468, 2007 WL 2782030, at *5 (E.D. Cal. Sep. 18, 2007) (Nike mark is famous in part because it spent more than $1 billion to promote its products in the U.S.).

Similarly, a small advertising budget can lead to a finding that a mark is not famous. *See GMA Accessories, Inc. v. Croscill, Inc.*, No. 06-6236, 2008 WL 591803, at *10 (S.D.N.Y.

---

[18] The Mensa Mark is registered multiple times for different uses on the PTO's Principal Register. Def.'s Ex. 26. Thus, the fourth factor--location of the mark's registration--is not genuinely disputed and favors Mensa.

Mar. 3, 2008) ($17,000 spent in advertising over eleven years leads to a finding of no fame).  As noted above, Mensa spent only $7,000-$22,000 a year on advertising from 2003-2007.  Def.'s Ex. 9.  Mensa admits it spends very little on advertising, but argues that it is famous.

Other types of publicity, such as appearances in the media, also show fame.  *See KST Elec.*, 550 F. Supp. 2d at 677-78 (University of Texas Longhorns logo displayed in countless sporting events--including some very highly rated--on television).  As noted above, Mensa has provided evidence of its numerous appearances on television, in movies, and in magazines and newspapers.  *See supra* Section II.B.1.b.  Mensa's other recognition includes holding annual gatherings of between 1,500-2,400 people, Def.'s Ex. 18, Pamela Donahue Dep. 125:6-125:11, May 29, 2008, and publishing a bulletin that goes primarily to its members, and a research journal with a circulation of 2,500 per issue that is open to the public.  *Id.* 95:17-96:5.

　　　2.　Volume and Reach of Sales

A large volume of sales and high revenues therefrom also show a mark's fame.  *See Jada Toys*, 518 F.3d at 635 (three billion HOT WHEELS units sold); *V Secret Catalogue*, 558 F. Supp. 2d at 743-44 (over 1,000 Victoria's Secret stores in the U.S., and 2006 sales revenues exceeded $4.9 billion); *KST Elec.*, 550 F. Supp. 2d at 678 (University of Texas products retail sales of

31

nearly $400 million in 2005-2006); *Visa Intern. Serv. Ass'n*, 533
F. Supp. 2d at 1096 (sales involving Visa cards totaled $1.3
trillion in 2006, there are 503 million Visa cards in the U.S.,
and Visa is accepted at 6.3 million locations); *Nike*, 2007 WL
2782030, at *5 (Nike sales exceeded $1 billion per year).

On the other hand, small revenues cast doubt on a mark's
fame.  *See Argus Research Group*, 562 F. Supp. 2d at 282-83
(denying summary judgment "[i]n an abundance of caution" and
casting doubt on plaintiff's ability to succeed because its
revenues were less than $20 million annually and were
"substantially less" than other famous marks); *GMA Accessories*,
2008 WL 591803, at *10 (revenues of less than $3 million a year
leads to finding of no fame).

Mensa's licensing revenue averaged $23,000 a year from 2003-
2004.  Def.'s Ex. 8.  Mensa does not dispute that its sales are
significantly less than those of companies in prior cases.  It
contends, however, that its "primary objective is to satisfy its
responsibilities to its members and not to sell products."  Pl.'s
Opp. at 15-16.

> 3.   Actual Recognition

The TDRA is "a rigorous and demanding test" and "requires
that the mark be widely recognized by the general consuming
public."  4 McCarthy, *supra*, § 24:106.  As a result, surveys for
famous marks should reveal actual recognition at approximately 75

percent of the general public.  *Id.*  Although the Court does not require a bright line percentage of survey responses, nor consider McCarthy's opinion binding, it is persuasive and reflects results in other cases.  *See Visa Intern. Serv. Ass'n*, 553 F. Supp. 2d at 1097 (99 percent of survey respondents were aware of Visa credit cards); *7-Eleven, Inc. v. Lawrence I. Wechsler*, 2007 WL 1431084, at *14 (T.T.A.B. 2007) (73 percent of respondents knew of BIG GULP mark); *The Nasdaq Stock Mkt. v. Antartica, S.R.L.*, 2003 WL 22021943, at *12 (T.T.A.B. 2003) (80 percent awareness in plaintiff's stock market).

Mensa correctly argues that direct evidence of recognition through survey responses is not required.  *See McNeil Consumer Brands, Inc. v. U.S. Dentek Corp.*, 116 F. Supp. 2d 604, 607 (E.D. Pa. 2000) (opponent does not contest that Tylenol is famous); *Am. Express Co. v. CFK, Inc.*, 947 F. Supp. 310, 315 (American Express's "Don't leave home without it" slogan is "widely recognized throughout the world" despite lack of survey). However, Mensa is not a "household name," *KST Elec.*, 550 F. Supp. 2d at 679, like American Express and Tylenol.  Rather, it admittedly and proudly accepts as members only very intelligent individuals, and allows certain third parties to use the Mensa name on its products.  Mensa does not have nearly the same level of notoriety as the companies with which it compares itself.

Mensa's expert's study revealed that 59 percent of

respondents had heard the term "mensa" before.  Def.'s Ex. 3.
That 59 percent of respondents had heard of Mensa does not answer
the inquiry.  The TDRA states that a mark is famous if it is
recognized by the public "as a designation of source of the goods
or services of the mark's owner."  § 1125(c)(2)(A).  Thus, the
relevant question is how many respondents identified the Mensa
Mark as representing the goods and services that Mensa actually
provides.  The survey respondents' only significant association
of the Mensa Mark was to denote intelligence, and a high IQ
group.  Def.'s Ex. 3.

In sum, the TDRA significantly increased the difficulty of
proving a dilution claim by requiring a mark to be famous to the
general public.  Unless a mark is a "household name" whose fame
is not at all in doubt, it cannot support a dilution claim.  *KST
Elec.*, 550 F. Supp. 2d at 679 (University of Texas's longhorn
logo, which has been repeatedly shown in the media, is not a
household name--like Buick or Kodak--that can withstand summary
judgment).  Although Mensa has been mentioned in the media, it
has spent little money on advertising and receives little
revenue.  It is not a household name like those marks that have
earned dilution protection, such as Hershey's, Nike, Visa, and
American Express.[19]  Given the evidence, judgment must be granted

---

[19] Other successful household name marks cited above include
Victoria's Secret, Mattel, 7-Eleven, Nasdaq, and Tylenol.

to the Defendants on Mensa's dilution claim.

D.   Motion to Amend Scheduling Order

Mensa seeks to modify the Scheduling Order to reopen discovery for the purpose of deposing Inpharmatica's custodian of records to establish the admissibility of business records. Inpharmatica responds that the Scheduling Order should not be amended because it will be prejudiced, and Mensa was not diligent in discovery.

Federal Rule of Civil Procedure 16 provides that a scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Rule 16's good cause standard focuses on the diligence of the movant.  *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002); *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D. Md. 1999).  If the movant was not diligent, the inquiry should end.  *Rassoull*, 209 F.R.D. at 374.

Mensa deposed Inpharmatica's custodian of records on June 18, 2008.  Thereafter, on June 25, 2008, Inpharmatica produced thousands of additional documents; Mensa was unable to depose the custodian on those records.  Approximately 60 percent of the records about which Mensa now seeks to depose the custodian were produced before the June 25 deposition.  Mensa has not provided a valid explanation for its failure to depose the custodian on those records.  Obviously, Mensa could not have deposed the

35

custodian on the records produced after his deposition.  Because
Mensa did not fail to exercise diligence with regard to the
later-produced documents, it should have an opportunity to depose
Inpharmatica's custodian about them.  Thus, discovery will be
reopened for the limited purpose of permitting Mensa to depose
Inpharmatica's custodian on the belatedly-produced documents.

III. Conclusion

For the reasons discussed above, the Defendants' motion for
summary judgment will be granted in part and denied in part, and
Mensa's motion to amend the scheduling order will be granted.


<u>November 6, 2008</u>                    _____/s/_____
Date                               William D. Quarles, Jr.
                                   United States District Judge